UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------x
WALTER JACKSON,

        Plaintiff,

   -against-

SLEEPY'S, LLC and
ERIC LEE-HUGH,

        Defendants.
-----------------------------------------------x

**MEMORANDUM AND ORDER**
No. 13-CV-2086 (FB) (SMG)

*Appearances:*
*For the Plaintiff:*
VINCENT I. EKE-NWEKE, ESQ.
498 Atlantic Avenue
Brooklyn, New York 11217

*For Defendants:*
THEO E.M. GOULD, ESQ.
JOSEPH E. FIELD, ESQ.
Littler Mendelson, P.C.
900 Third Avenue
New York, New York 10022

**BLOCK, Senior District Judge:**

     Walter Jackson claims that he was subject to discrimination and retaliation while employed at Sleepy's, LLC.  He sues Sleepy's and his former manager, Eric Lee-Hugh, under 42 U.S.C. § 1981, Title VII of the Civil Rights of 1964, the New York State Human Rights Law and the New York City Human Rights Law.

     Both defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56.  For the following reasons, the motion is granted in part and denied in part.

# I

The following facts are either undisputed or, if disputed, presented in the light most favorable to Jackson:

Sleepy's is a retailer of mattresses and related products. Jackson—a black male from St. Vincent in the West Indies—worked as a sales associate in Sleepy's Queens Region from May 18, 2009, to October 25, 2010.

Sales associates are rotated among various showrooms in the region. The rotations are set by the regional managers. When Jackson began working for Sleepy's, his regional manager was James Constantinides. Steven Bucher later replaced Constantinides. Jackson had "no gripes" with Constantinides's schedules, Dep. of Walter Jackson (Mar. 5, 2014) 69, and thought Bucher's schedules were "okay," *id.* 70.

On August 15, 2010, Lee-Hugh—who is black, but not of West Indian descent—took over as regional manager. Sleepy's asserts that Lee-Hugh did not make any scheduling decisions until September 29th, but there is some evidence that he made decisions a month earlier.

The crux of Jackson's discrimination claim is that Lee-Hugh assigned him less frequently to stores with a high sales volume and more frequently to stores with a low sales volume. In the thirty-three weeks between January 3 and August 28, 2010, Lee-Hugh's predecessors assigned Jackson to high-volume stores 48 times, an average of

1.45 times per week.  Lee-Hugh, by contrast, assigned Jackson to the same stores 2 times in eight weeks, an average of 0.25 times per week.  Similarly, Jackson was assigned to low-volume stores an average of 1.79 times per week before Lee-High took over as regional manager, and an average of 3.13 times per week afterwards.

Jackson claims that the assignments hurt his sales performance.  Sleepy's sales associates work on commission, but they draw a salary in advance against which their commissions are credited.  A sales associate who fails to make enough in commissions to cover his or her salary is "negative to draw."

On October 5, 2010, Jackson sent Lee-Hugh an email objecting to his assignments:

> Month after month, week after week, I am consistantly [sic] scheduled in the lower performing showrooms.  Some showrooms obviously do much more business because of the socio-economic and demographics of the neighbourhood or their locations.
>
> I am employed as a commission sales employee and expect a fair and equal opportunity to produce and earn.  It is not necessary to get into any further details, for I do think my comments are self explanatory.

Decl. of Theo Gould, Ex. N.  Three days later, Lee-Hugh met with Jackson.  In response to Jackson's concern that he was being assigned too often to low-volume stores, Lee-Hugh said that higher-volume stores would go to associates with more sales.  When Jackson asked that his mix of assignments include two of the highest-volume stores, Lee-Hugh said, "It ain't happening."  Jackson Dep. 119.

Jackson concedes that the focus of the meeting was on his own scheduling assignments.  *See id.* 118 ("I'm here to talk about myself.").  At his deposition, however, he stated that he had also mentioned race discrimination:

A.    I said why [are] the white ones being in the better stores than the minority ones.

Q.    Did you say to Mr. Lee-Hugh specifically that you thought that white people were in better stores than minorities?

A.    I did.

Q.    You used the word "minorities?"

A.    Yes.

Q.    You used the word "white?"

A.    Yes.

Q.    In that meeting with Mr. Lee-Hugh.

A.    Yes, sir.

*Id.* 119-20.

On October 12, 2010, Lee-Hugh gave Jackson a "Performance Improvement Plan" ("PIP") identifying three areas for improvement: average sales ticket, sale of accessories and use of DORMO, a diagnostic device for helping customers choose a mattress.  The PIP listed a "goal" for each category and set an "achievement date" of November 12, 2010.  Decl. of Eric Lee-Hugh, Ex. A.  It also noted that Jackson was negative to draw in the amount of $1,400, and recited that "failure to meet or sustain

improved performance will lead to Walter's termination." *Id.* Jackson understood the PIP to mean that "obviously, no matter what, in 30 days, I would have been terminated." Jackson Dep. 193. Lee-Hugh, however, stated at his deposition that "any improvement is what our expectation was." Dep. of Eric Lee-Hugh (Mar. 26, 2014) 130.

After receiving the PIP, Jackson, by his own admission, "went to work as usual and did the same things with customers as I did [before]." Jackson Dep. 197; *see also id.* 198 ("Everything I normally do I continued to do."). In his opinion, he could only improve his performance "if [he] was being assigned to stores with better traffic." *Id.* 200.

Jackson worked at a low-volume store (designated "YR" in Sleepy's records) twice during the week of October 17, 2010. Though the store was physically located in Queens, the parties vigorously dispute whether it was part of Sleepy's Queens Region or its Brooklyn Region. Jackson was assigned to work at the same store twice during the following week, but did not report because he resigned on October 25th. He pursued a claim of race discrimination with the EEOC and, after receiving a right-to-sue letter, filed suit.

## II

Jackson's theory of the case is as follows: Lee-Hugh assigned him to low-volume stores (and failed to assign him to high-volume stores) because he is black and

from the West Indies.[1]  When Jackson complained about the discriminatory treatment, Lee-Hugh retaliated by issuing the PIP and assigning Jackson to the YR  store. Jackson claims that the store assignments and PIP collectively amounted to a constructive discharge.  The Court will address each claim in turn.

## A.  Discrimination

Jackson's discrimination claims under Title VII, § 1981, the NYSHRL and the NYCHRL are all subject to the familiar burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010); *Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010). First, he must make out a prima facie case of discrimination by showing that "1) he belonged to a protected class; 2) he was qualified for the position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Terry v. Ashcroft*,

---

[1]Jackson asks the Court to "construe his Complaint as asserting both race based and national origin based discrimination claims."  Pl.'s Mem. of Law 2. Defendants object that Jackson did not explicitly raise national-origin discrimination before the EEOC.  "[C]ourts have . . . recognized that race and national origin discrimination claims may substantially overlap or even be indistinguishable depending on the specific facts of a case," *Deravin v. Kerik*, 335 F.3d 195, 201 (2d Cir. 2003), and the Second Circuit has cautioned that "courts should not attempt to draw overly fine distinctions between race and national origin claims as part of the threshold exhaustion inquiry prior to the full development of a plaintiff's claims."  *Id.* at 202.  In any event, the Court's ultimate disposition of the discrimination claims makes it unnecessary to address the objection.

336 F.3d 128, 138 (2d Cir. 2003).  If he succeeds, "the burden shifts to the defendant to articulate 'some legitimate, non-discriminatory reason for its action.'"  *Holcomb v. Iona College*, 521 F.3d 130, 138 (2d Cir. 2008) (quoting *McDonnell Douglas Corp.*, 411 U.S. at 802).  At that point, Jackson "may no longer rely on the presumption raised by the prima facie case, but may still prevail by showing, without the benefit of the presumption, that the employer's determination was in fact the result of . . . discrimination."  *Id.*

The fourth element of the prima facie case is dispositive in this case.  The only evidence that Lee-Hugh assigned sales associates to stores based on their race or ethnicity is a table summarizing assignments to two high-volume stores between August 29 and October 24, 2010.  Out of more than 200 shifts assigned, all but four went to white, Asian or Hispanic sales associates.

A plaintiff may, of course, raise an inference of discrimination with evidence that his employer "treated him less favorably than a similarly situated employee outside his protected group."  *Graham v. Long Is. R.R.*, 230 F.3d 34, 39 (2d Cir. 2000).  But he or she "must show [he or] she was 'similarly situated in all material respects' to the individuals with whom she seeks to compare [himself or] herself."  *Id.* (quoting *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997).  The comparison need not be exact and will vary from case to case.  *Id.* at 40.

Jackson argues that his comparison is apt because all the comparators are sales associates under Lee-Hugh's supervision. The Court disagrees that this is sufficient. There is no evidence, for example, regarding the comparators' seniority relative to Jackson; it could be that better assignments went to more senior associates. There is also no evidence regarding their relative performance; it could be that better assignments went to better salespeople.[2]

Moreover, Jackson's proffered evidence offers no insight as to why *he* was not assigned to high-volume stores more frequently. "Statistics alone are insufficient in a disparate-treatment claim because an individual plaintiff must prove that he or she *in particular* has been discriminated against." *Drake v. Delta Air Lines, Inc.*, 2005 WL 1743816, at *6 (E.D.N.Y. July 21, 2005) (citing *Hudson v. International Bus. Machs. Corp.*, 620 F.2d 351 (2d Cir.1980)), *aff'd*, 216 Fed. App'x 95 (2d Cir.2007).

The point is not that Jackson has failed to make an exact comparison, but that he has failed to offer *any* criteria for distinguishing assignments based on race from those based on other factors. The whole point of the fourth element of the prima facie

---

[2]Jackson argues that it was unfair to relegate associates with lower sales to low-volume stores because it deprived them of the opportunity to improve their sales by taking advantage of the greater number of customers. The unfairness of an employment decision does not give rise to an inference of unlawful discrimination. *Cf. Norton v. Sam's Club*, 145 F.3d 114, 120 (2d Cir. 1998) ("[T]he ADEA does not make employers liable for doing stupid or even wicked things; it makes them liable for *discriminating*, for firing people on account of their age.").

case is to require the plaintiff to weed out enough of the myriad reasons for an employment decision to justify an inference that the reason was discrimination. This Jackson has not done. Since Jackson has not made out of a prima facie case of discrimination, the Court need not address the remainder of the *McDonnell Douglas* analysis.

## B. Retaliation

A retaliation claim is subject to the same burden shifting as a discrimination claim. *See Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010). To make out a prima facie case of retaliation, a plaintiff must show "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Id.* (citations and internal quotation marks omitted).

With respect to the first element, the Court must accept as true Jackson's deposition testimony that he specifically mentioned race discrimination when he met with Lee-Hugh on October 8, 2010. The defendants point to a statement in the EEOC investigator's notes that Jackson had "indicated that he asked [Lee-Hugh] why some sales personnel were assigned to stores, but did not specify/indicate race." Decl. of Jean E. Mulligan, Ex. A. That note, however, refers to the October 12th meeting at which Lee-Hugh gave Jackson the PIP. At best, it impeaches Jackson's credibility, which cannot be addressed on summary judgment.

There is no dispute that Lee-Hugh was aware of Jackson's complaint. His knowledge is imputed to Sleepy's.

With respect to the third element, an employment action is sufficiently adverse to support a retaliation claim under § 1981, Title VII and the NYSHRL if it was "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Hicks*, 593 F.3d at 162 (quoting *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 57 (2006). It is not limited—as it is in the discrimination context—to "actions that affect the terms and conditions of employment." *Id*. The standard under the NYCHRL is whether a jury could "reasonably conclude from the evidence that [the challenged] conduct was, in the words of the statute, 'reasonably likely to deter a person from engaging in protected activity'" *Williams v. New York City Housing Auth.*, 872 N.Y.S.2d 27, 34 (1st Dep't 2009) (quoting N.Y.C. Admin. Code § 8-107(7)). Although the practical difference between the federal/state and city standards remains a mystery, *see Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 723 (2d Cir. 2010) ("It is unnecessary for us to determine on this appeal whether or to what extent the 'reasonably likely to deter' standard of the [NY]CHRL differs from *Burlington*'s 'well might have dissuaded' test."), the city standard is widely understood as broader. *See id*. Thus, any action that qualifies as adverse under the federal/state standard will necessarily satisfy the city standard as well.

In *Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11 (2d Cir. 2012), the Second Circuit held that "[a] reasonable juror could find both that [the defendant] threatened [the plaintiff] with the loss of his job, and that this threat would 'dissuade[] a reasonable worker from making or supporting a charge of discrimination.'" *Id.* at 26 (quoting *Burlington Northern*, 548 U.S. at 68). Since Jackson's PIP contemplated possible termination, it qualifies as an adverse employment action. The Court further concludes that, because it might adversely affect commissions, assignment to the "YR" store could dissuade a reasonable employee from pursuing a discrimination complaint; indeed, the defendants do not dispute that such assignments would qualify as adverse employment actions under the higher standard for discrimination claims. *Accord Richmond v. General Nutrition Ctrs. Inc.*, 2011 WL 2493527, at \*10 (S.D.N.Y. June 22, 2011) ("The allegedly lower volume of sales at his new store, combined with the loss of his regular clientele and the resulting commissions, could lead a reasonable fact-finder to find that [the plaintiff] suffered an adverse employment action when he was transferred from the Greenburgh Store to the White Plains Store.").

The defendants do not dispute that the temporal proximity between the protected activity and the adverse employment action gives rise to an inference of retaliation. With respect to the assignments to the "YR" store, however, the Court concludes that the inference does not arise because the assignments were merely the

continuation of a practice that began before Jackson complained to Lee-Hugh. *See Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.").

In sum, Jackson has made out a prima facie case of retaliation based on the PIP. The burden, therefore, shifts to the defendants to offer a legitimate, non-retaliatory reason. They cite Jackson's subpar performance in the areas listed on the PIP.

The ultimate burden then returns to Jackson. In *University of Texas Southwestern Medical Center v. Nassar*, 133 S. Ct. 2517 (2013), the Supreme Court clarified that burden: "[A] plaintiff making a retaliation claim . . . must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Id.* at 2534. "'[B]ut-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive," *Zann Kwan v. Andalex Group LLC*, 737 F.3d 834, 846 (2d Cir. 2013), and a plaintiff may still satisfy his burden "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Id.*

Jackson's evidence is hardly overwhelming, but there is one dispute from which a jury could reasonably infer that the PIP was a pretext for retaliation. At his

deposition, Lee-Hugh stated that he would give an associate a PIP when he or she was "around $1,000 negative to draw." Lee-Hugh Dep. 126. According to Sleepy's records, Jackson was at that point as early as August 2010. When asked why he had not given Jackson a PIP earlier, Lee-Hugh replied: "I can't think of a reason." *Id.* 125. That testimony, coupled with the temporal proximity between the PIP and Jackson's complaint, would support an inference that, Lee-Hugh would not have given Jackson the PIP but for the latter's complaint.

## C. Constructive Discharge

Finally, Jackson argues that Lee-Hugh's conduct amounted to a constructive discharge. Constructive discharge is not a stand-alone claim; rather, it serves as an adverse employment action entitling the plaintiff, if successful, to the same damages as an employee who was actually terminated for an unlawful reason. *See Pennsylvania State Police v. Suders*, 542 U.S. 129, 148 (2004) ("[A] constructive discharge is functionally the same as an actual termination in damages-enhancing respects.").

"[A] claim of constructive discharge must be dismissed as a matter of law unless the evidence is sufficient to permit a rational trier of fact to infer that the employer deliberately created working conditions that were so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 361 (2d Cir. 1993) (citations and internal quotation marks omitted). Claims of dissatisfaction with work assignments, unfair criticism or unpleasant working conditions will not suffice. *See id.* at 360. A threat of termination may be evidence of a constructive discharge *if* it presents the employee with the choice to resign or be fired. *See Murray v. Town of North Hempstead*, 853 F. Supp. 2d 247, 269 (E.D.N.Y. 2012) (collecting cases).

Jackson's dissatisfaction with his store assignments falls well short of the necessary level of difficulty or unpleasantness. Although the PIP stated that he would

face termination if he did not show improvement, there is no evidence to support his contention that he would have been fired "no matter what." Jackson Dep. 193. For these reasons, Lee-Hugh's actions do not, as a matter of law, amount to a constructive discharge.

## III

For the foregoing reasons, defendants' motion for summary judgment is denied with respect to Jackson's retaliation claims based on the PIP.[3] It is granted in all other respects.

**SO ORDERED**.

Frederic Block
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
March 29, 2016

---

[3]Liability under Title VII is limited to Sleepy's, but § 1981, the NYSHRL and the NYCHRL impose liability on both employers and individuals who personally participate in retaliatory conduct. *See Patterson v. County of Oneida*, 375 F.3d 206, 229 (2d Cir. 2004) (§ 1981); *Malena v. Victoria's Secret Direct*, 886 F. Supp. 2d 349, 366 (S.D.N.Y. 2012) (NYSHRL and NYCHRL). Thus, the case shall proceed to trial against both defendants.